CJF4.1.19

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2019 APR 11  PM

CLERK'S OFFICE
AT BALTIMORE

BY MS  DEPUTY

*Patricia McLane*
*Assistant United States Attorney*
*Patricia.mclane@usdoj.gov*

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4942
MAIN: 410-209-4800
FAX: 410-962-0717

April 1, 2019

Ivan Bates, Esq.
201 N. Charles Street
Suite 1900
Baltimore MD 21202

Re:   United States v. Keenan Lawson
      Criminal No. GLR-16-0453 (D. Md.)

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Keenan Lawson (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **April 8, 2019**, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offense of Conviction

1.      The Defendant agrees to plead guilty to Count 1 of the First Superseding Indictment which charges the Defendant with conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d). The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

### Elements of the Offense

2.      The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case are that, on or about the time alleged in the Indictment, in the District of Maryland:

   a.     The criminal enterprise set out in the First Superseding Indictment existed;

   b.     The enterprise affected interstate or foreign commerce;

   c.     The Defendant was associated with or employed by the enterprise; and

   d.     The Defendant willfully and knowingly became a member of the conspiracy.

Penalties

3.      The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| COUNT | STATUTE | MAND. MIN. IMPRISON-MENT | MAX IMPRISON-MENT | SUPERVISED RELEASE | MAX FINE | SPECIAL ASSESS-MENT |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1962(d) | NA | Life | 5 years | $250,000 | $100 |

a.      Prison:  If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b.      Supervised Release:  If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment up to the entire original term of supervised release if permitted by statute, followed by an additional term of supervised release.

c.      Restitution:  The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d.      Payment:  If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d).  The Defendant may be required to pay interest if the fine is not paid when due.

e.      Forfeiture:  The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f.      Collection of Debts:  If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt.  If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law.  Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control.  Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns.  The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

2

## Waiver of Rights

4.     The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a.     If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.     If the Defendant elected ·a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.     If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d.     The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

e.     If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.     By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g.     If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up

3

the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

       h.     By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5.     The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.    a.     This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A. This Office and the Defendant further agree that pursuant to U.S.S.G. § 2E1.1(a)(2) and Application Note 1, the base offense level for a violation of 18 U.S.C. § 1962(d) is driven by the greater of 19 or the offense levels applicable to the underlying activity. The applicable racketeering activity here includes, but is not limited to, first degree murder. Under U.S.S.G. § 2A1.1, the base offense level is **43**.

       b.     This Office does not oppose a two-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's acceptance of personal responsibility for the Defendant's conduct. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal

conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7.   There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8.   Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Rule 11(c)(1)(C) Plea

9.   The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a sentence of **276 months' incarceration** is the appropriate disposition. The parties further agree that, regardless of the Defendant's criminal history or Career Offender status, as determined at the time of sentencing or at any time thereafter, a sentence of **276 months' incarceration** is the appropriate disposition of this case under the factors set forth in 18 U.S.C. § 3553(a). This agreement does not affect the Court's discretion to impose any lawful fine or to set any lawful conditions of probation or supervised release. In the event that the Court rejects this plea agreement, *either* party may elect to declare the agreement null and void. Should the Defendant so elect, he will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5).

## Obligations of the United States Attorney's Office

10.   At the time of sentencing, this Office will recommend a sentence of **276 months' incarceration**. This Office will also move to dismiss any open counts against the Defendant.

## Waiver of Appeal

11.   In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a.   The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s).

b.   The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment

of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

c.    The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

<u>Defendant's Conduct Prior to Sentencing and Breach</u>

12.    a.    Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

b.    If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement; and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea.   The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea if the Court finds that the Defendant breached the Agreement.

<u>Court Not a Party</u>

13.    The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence is imposed by the Court, and the Court is under no obligation to accept this plea agreement. In the event the Court rejects this Rule 11(c)(1)(C) plea agreement, pursuant to Rule 11(c)(5)(C), the Defendant will be informed that he may withdraw his plea. If he persists in the guilty plea thereafter, the Defendant understands that the disposition of the case may be less favorable than that contemplated by this agreement. The Defendant understands that neither this Office, his attorney, nor the Court can make a binding prediction or promise that the Court will accept this agreement. The Defendant agrees that no one has made such a binding prediction or promise.

6

Entire Agreement

14.     This letter, together with the Sealed Supplement, constitutes the complete plea agreement
in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings,
promises, or conditions between this Office and the Defendant.  There are no other agreements,
promises, undertakings, or understandings between the Defendant and this Office other than those
set forth in this letter and the Sealed Supplement.  No changes to this Agreement will be effective
unless in writing, signed by all parties and approved by the Court.

        If the Defendant fully accepts each and every term and condition of this Agreement, please
sign and have the Defendant sign the original and return it to me promptly.

                            Very truly yours,

                            Robert K. Hur
                            United States Attorney

                    By:

                            Patricia McLane
                            Michael C. Hanlon
                            Assistant United States Attorneys


        I have read this Agreement, including the Sealed Supplement, and carefully reviewed every
part of it with my attorney.  I understand it and I voluntarily agree to it.  Specifically, I have
reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to
change any part of it.  I am completely satisfied with the representation of my attorney.

4-8-19                            Keenan Lawson
Date                              Keenan Lawson


        I am the Defendant's attorney.  I have carefully reviewed every part of this Agreement,
including the Sealed Supplement with the Defendant.  The Defendant advises me that the
Defendant understands and accepts its terms.  To my knowledge, the Defendant's decision to enter
into this Agreement is an informed and voluntary one.

4/8/19
Date                              Ivan Bates, Esq.

                                  7

**ATTACHMENT A**

The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.

From at least 2002, a group known as "Hillside" operated primarily in the part of the Cherry Hill neighborhood in Baltimore, Maryland, known as "Hillside." Members of Hillside distributed cocaine, cocaine base (commonly known as crack), heroin, oxycodone, and marijuana in the 600 block of Cherry Hill Road in Baltimore City, Maryland, an area known as the Cherry Hill Shopping Center. Distribution activities were also conducted in other locations throughout Cherry Hill, and in west and southwest Baltimore City. This group, which constituted an enterprise as defined by 18 U.S.C. § 1962, and affected interstate commerce, consisted of the Defendant, KEENAN LAWSON (a/k/a "BlackFace"), DELONTE CONLEY (a/k/a "Tay"), TRAVIS ALEWINE (a/k/a "Sticks"), JERRYAN BURREL (a/k/a "Rhino"), LEONARD CHASE (a/k/a "Nard"), DEAVEN CHERRY (a/k/a "Gotti"), CHRISTOPHER DUKES (a/k/a "Scarface"), MICHAEL EVANS (a/k/a "Pee Wee"), MARSHON FLOYD (a/k/a "Killer"), KEVIN HORSEY (a/k/a "What What"), MARCUS JOHNSON (a/k/a "Black"), STEVIE LAWSON (a/k/a "GB"), TERRELL LUSTER (a/k/a "Relly"), CINTRONT LYNN (a/k/a "Stitch," "Liz Cuz"), VAN McNUTT (a/k/a "Butt Butt"), DEVIN RODGERS (a/k/a "Donkey," "Dick Butkus"), DANIEL SEAWELL (a/k/a "June Bug"), MICHAEL TRUEHART (a/k/a "Papers"), ROBERT WHITE (a/k/a "Beanhead"), LEMAR WILLIAMS (a/k/a "Mar," "Tutta"), and others, associated together committing acts of robbery, homicides, non-fatal shootings, and drug distribution, to include distribution of various types of controlled dangerous substances, such as cocaine, cocaine base, heroin, oxycodone, and marijuana. Hillside was responsible for the distribution of at least one kilogram of heroin (a

8

Schedule I controlled substance); 280 grams of cocaine base (a Schedule II controlled substance); 5 kilograms of cocaine (a Schedule II controlled substance), a detectable amount of marijuana, (a Schedule I controlled substance) and a detectable amount of oxycodone (a Schedule II controlled substance). Members of Hillside used the proceeds of the sale of narcotics to purchase firearms, to enrich themselves, and to further the activities of the organization, including narcotics trafficking.

Members of the Hillside Enterprise used residences in and around Cherry Hill to cut and package quantities of controlled substances for distribution. These locations included but were not limited to two locations: A house at 453 Roundview Road and an apartment at 2300 Terra Firma Road in Cherry Hill. Only trusted members of the Hillside Enterprise were admitted to these locations during the preparation of controlled substances for sale. Members of the enterprise often distributed small amounts of controlled substances to the tenants as payment for the use of their homes. Sometimes the tenant was given cash. In an effort to distinguish their narcotics, members used colored topped vials or colored the drugs with food coloring.

Hillside members and associates have been in a long-running dispute with persons not part of the gang. These rival organizations include, but are not limited to Up Da Hill ("UDH"), the Lakebrook Circle Boys, and others. Members and associates of Hillside have routinely engaged in acts of violence, including murder, directed at members of these rival organizations, or persons who happen to be located on territory controlled by these rival organizations. These acts of violence, including the homicides were reasonably foreseeable to KEENAN LAWSON as a member of Hillside.

Members and associates of Hillside protected themselves, the organization, and their control of the drug trade in the Hillside part of Cherry Hill, and engaged in their disputes with

9

UDH, the Lakebrook Circle Boys, and others through violence and intimidation. Additionally, members of Hillside committed and caused to be committed acts of violence in furtherance of the organization's activities, including shootings, beatings, murders, and other violence in order to intimidate others who would interfere with their narcotics trafficking. Acts of violence were also committed as discipline and sanctions of members within the Hillside Enterprise for transgressions, real or perceived, against the conspiracy.

KEENAN LAWSON ("LAWSON") is a member and associate of Hillside and participated in a racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). LAWSON knew members of Hillside to sell narcotics through Hillside territory. LAWSON also knew members of Hillside committed acts of violence against rival gangs or others who impeded on Hillside's territory. Throughout the course of his involvement in the Hillside racketeering conspiracy, it was reasonably foreseeable to LAWSON that Hillside was responsible for the distribution of at least 1 kilogram but less than 3 kilograms of heroin; at least 280 grams but less than 840 grams of cocaine base; at least 5 kilograms but less than 15 kilograms of cocaine; a detectable amount of marijuana; and a detectable amount of oxycodone.

LAWSON participated in the activities of the Racketeering Enterprise in the District of Maryland. Some examples of LAWSON's participation in the Racketeering Enterprise include, but are not limited to:

- Attempted Murder of Brandon McMillan. On July 24, 2011, at 11:08 p.m., in the 2500 block of Seamon Avenue, K. LAWSON shot at Brandon McMillan.

- Murder of Yolanda Johnson. On May 10, 2013, at 10:45 p.m., K. LAWSON hit and killed an innocent bystander, Yolanda Johnson.

- Attempted Murder of Colin Frost. On August 1, 2014, at 7:56 pm, Colin Frost was shot in the 3000 block of Elizabeth Avenue.

10

- <u>Distribution of Narcotics</u>. There is significant evidence that K. LAWSON was selling drugs as a member of Hillside. Specifically, there would be testimony that K. LAWSON possessed with the intent to distribute cocaine in Hillside territory on September 20, 2013, September 12, 2014; distributed crack cocaine to an undercover officer on March 9, 2015 and March 13, 2015; and that he was captured on consensually recorded video in the cut houses used by Hillside (with other members of Hillside) preparing controlled substances at least seventeen times between November 2014 and September 2015. K. LAWSON further agrees that the substances Hillside distributed were in fact controlled substances, specifically, cocaine and crack cocaine were a Schedule II narcotic and heroin and marijuana was a Schedule I narcotic.

SO STIPULATED:


_Keenan Lawson_
Keenan Lawson
Defendant


_Patricia McLane_
Patricia McLane
Assistant United States Attorney


_Ivan Bates_
Ivan Bates, Esq.
Counsel for Defendant